# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ROBERT THOUSAND,

                            Plaintiff,

         v.                                     9:15-CV-1025 (MAD/ATB)

S. CORRIGAN, et al.,

                            Defendants.

ROBERT THOUSAND, Plaintiff, *pro se*
MARIA E. LISI-MURRAY, Ass't Att'y Gen., for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

      This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c) by the Honorable Mae. A. D'Agostino, United States District Judge.

      In this civil rights action, plaintiff alleges that he was assaulted by defendants Corrigan, Jones, and Segovis on January 27, 2014, while plaintiff was confined by the New York Department of Corrections and Community Supervision ("DOCCS") at Great Meadow Correctional Facility ("Great Meadow"). (Dkt. No. 1, Compl.). Plaintiff further alleges that defendants Carpenter, O'Brien, and Scarlotta knew or should have known about the assault and failed to intervene, and that defendants Liberty and Prack violated plaintiff's due process rights during the administrative disciplinary process arising out of the same incident. Plaintiff seeks substantial monetary relief. (Compl. at 22-23[1]).

---

[1] Page references in the record citations are to the pagination in the CM/ECF system, unless otherwise noted.

Presently before the court is defendants' motion for partial summary judgment pursuant to Fed. R. Civ. P. 56, only as to the failure to intervene and due process claims. (Dkt. No. 30). Plaintiff has responded in opposition to the motion. (Dkt. Nos. 38, 39). For the following reasons, this court agrees with the moving defendants and will recommend granting their motion for partial summary judgment.

## DISCUSSION

### I.    Factual Contentions and Procedural History

The relevant facts in this case were outlined in Judge D'Agostino's October 5, 2015 decision on initial review of the complaint (Dkt. No. 5) and will be recited herein for clarity and continuity, with additional details drawn from the papers filed in connection with this motion.

#### A.    Plaintiff's Allegations of Excessive Force

On January 27, 2014, plaintiff was confined in the C-Block (5-company, 9-cell) at Great Meadow. (Compl. ¶ 28). In the early morning hours, plaintiff walked to C-1 company, a separate area where inmates report to wait for an escort to the messhall for meals. (*Id*. ¶ 29). While plaintiff was on C-1 company, a fight broke out between two inmates. (*Id*. ¶ 30). Defendant Carpenter, one of the first correctional officers to respond, ordered the uninvolved inmates, including plaintiff, to "get on the wall," which signaled the inmates to place their hands up against the wall in a pat frisk position. (*Id*. ¶ 31). An alarm was pulled, drawing other correctional officers, including defendants Scarlotta, Corrigan and Jones, to C-1 company. (*Id*.; Dkt. No. 30-6, Scarlotta Decl. ¶ 6).

2

Plaintiff claims that defendants Corrigan and Jones ignored the fighting inmates and instead began to choke, shove, and punch plaintiff. (Compl. ¶ 32-34). Plaintiff believed that this assault was prompted by a misunderstanding. A few days earlier, plaintiff had returned to his cell to find that his belongings had been thrown to the floor in an apparent cell search. (*Id*. ¶ 32, n.5). Plaintiff erroneously blamed defendant Corrigan for disturbing his cell, and mentioned it to defendant O'Brien. (*Id*.). Plaintiff subsequently learned that another inmate had accidentally knocked over plaintiff's storage locker. (*Id*.). Plaintiff believed that defendant Corrigan was taking the opportunity to physically retaliate against plaintiff for asking O'Brien questions about him. (*Id*. ¶ 33).

Plaintiff states that he "came off the wall," turned to supervising officer Scarlotta, and began yelling about the physical abuse. (*Id*. at 34). Defendant Scarlotta ordered defendants Corrigan and Jones to escort plaintiff back to his cell. (Scarlotta Decl. ¶ 6). During his deposition, plaintiff testified that at the time that Scarlotta ordered him returned to his cell, plaintiff had not yet suffered any physical injuries from the assaulting officers. (Dkt. Nos. 30-13, 30-14, Lisi-Murray Decl., Exs. C-1, C-2, Deposition Transcript ("Dep.") at 86[2]). After the fighting inmates had been restrained, defendant Scarlotta escorted one of them for medical treatment in a separate part of the facility. (Scarlotta Decl. ¶ 6).

Defendants Corrigan and Jones escorted plaintiff back to his cell, and ordered

---

[2] To avoid confusion, this court will refer to the original pagination in the deposition transcript, rather than the CM/ECF pagination.

defendant O'Brien to open plaintiff's cell. (Compl. ¶ 39). Defendant O'Brien was stationed nearby in a "console area" that controlled the doors, separate from the inmate's cells. (Dep. at 41; Dkt. No. 30-5, O'Brien Decl. ¶ 5). Plaintiff alleges that when the cell door opened, defendant Corrigan punched him in the back of the head and shoved him into the cell. (Compl. ¶ 39). Defendant Corrigan then pulled plaintiff's clothes line down on his way out of the cell. (Compl. ¶ 41). When plaintiff threatened legal action, defendant Corrigan ran back into the cell and began to "maliciously and sadistically" attack him. (Compl. ¶ 42-43). Defendant Jones then ran into the cell and administered a headlock that caused plaintiff to lose consciousness. (Compl. ¶ 44).

When plaintiff awoke, he was facedown outside his cell, in handcuffs and shackles. (Compl. ¶ 46). He testified that defendant Sergovis arrived and joined Corrigan and Jones in a physical assault that continued for several more minutes. (Dep. at 41). The attack only ended when plaintiff apologized. (Dep. at 42-43). Plaintiff suffered significant injuries from the use of force, including head trauma, vision damage, and an orbital fracture to his right eye socket that required surgery. (Dep. at 24-29).

### B. Misbehavior Report and Disciplinary Hearings

On January 28, 2014, defendant Corrigan issued a misbehavior report that charged plaintiff with violent conduct, assault on staff, possession of a weapon, and refusing a direct order.[3] (Dkt. No. 30-11, Lisi-Murray Decl., Ex. B, at 9). The report

---

[3] Plaintiff has repeatedly denied all of the charges in the misbehavior report.

alleged that when plaintiff entered his cell, he had punched defendant Corrigan in the face and ran to grab a plastic "ice pick type weapon" from the top of his storage locker. (*Id*.). In an effort to subdue plaintiff, defendant Corrigan "issued a series of blows, with closed fists." (Compl. ¶ 59).

Plaintiff's first disciplinary hearing in connection with these charges commenced on February 4, 2014.[4] (Compl. ¶ 62). He was found guilty of all charges and sentenced to the Special Housing Unit ("SHU"). (*Id*.). Plaintiff appealed the decision to defendant Prack in accordance with DOCCS regulations. (*Id*.). Defendant Prack ordered a new hearing, because the original hearing officer had not adequately questioned an inmate witness about his refusal to testify on plaintiff's behalf. (Dkt. No. 39-2, Pl.'s Decl, Ex. D, at 2).

A rehearing commenced on April 24, 2014, after plaintiff had been transferred to Upstate Correctional Facility. (Compl. ¶ 63). Defendant Liberty presided as hearing officer, and received telephone testimony by witnesses located at Great Meadow, including some of the named defendants. (Dkt. Nos. 30-21, 30-22, Lisi-Murray Decl., Exs. G and G-1, Rehearing Transcript[5] ("Rehearing"). Plaintiff also requested several inmate witnesses to testify on his behalf. (Rehearing at 5). Three inmates refused to testify at the rehearing, even though they had testified at plaintiff's

---

[4] The disciplinary hearing also addressed a separate misbehavior report for loss of state property. While packing up plaintiff's cell for transfer to SHU, a correctional officer was unable to locate plaintiff's facility-issued shaving razor. (Dkt. No. 30-11, Lisi-Murray Decl., Ex. B, at 10).

[5] To avoid confusion, this court will refer to the original pagination in the rehearing transcript, rather than the CM/ECF pagination.

first disciplinary hearing. (*Id*. at 17-18). When questioned by defendant Liberty, one inmate explained that he had testified once and that was all he was willing to do. (*Id*. at 61). Another inmate testified that he was sleeping when the incident occurred. (*Id*. at 62). A third inmate was held in keeplock and declined to speak with defendant Liberty, but had a correctional officer communicate on his behalf that the refusal to testify was knowing and voluntary. (*Id*. at 63). A fourth inmate had been released from Great Meadow and did not respond to several attempts to reach him. (*Id*. at 64).

Plaintiff also requested the testimony of inmate James Thomas, who had not testified at the first hearing. (*Id*. at 13). Inmate Thomas appeared by telephone from Great Meadow, but testified that he knew nothing about the January 27, 2014 incident. (*Id*. at 26-27). Plaintiff declined to ask Thomas any questions, stating, "Alright, if he doesn't recall then I have no questions." (*Id*. at 27).

In light of the various witnesses' refusal or unavailability to testify, plaintiff offered a purported transcript of his first hearing that had been provided to him by Prisoners Legal Services ("PLS"), an organization that had assisted him with his administrative appeals. (*Id*. at 28-29). At the time of the hearing, plaintiff did not know who had actually prepared the transcript.[6] (*Id*. at 85). Defendant Liberty contacted Great Meadow staff to determine the origin and authenticity of the transcript, but could only confirm that DOCCS staff had not prepared it. (*Id*. at 86). As a result, defendant Liberty refused to consider those portions of the transcript that

---

[6] The summary judgment record shows that the transcript had been prepared by a student intern at PLS from an audio recording of the first hearing obtained via a Freedom of Information Law request. (Dkt. No. 30-8, Prack Decl. Ex. A, at 23).

included inmate testimony. (*Id*. at 87). She did allow plaintiff to use the transcript to challenge defendant Carpenter's credibility. Defendant Liberty ultimately disregarded Carpenter's testimony at the re-hearing due to apparent inconsistencies with his original testimony. (*Id*. at 91).

On May 1, 2014, defendant Liberty found plaintiff guilty of all charges, and imposed a penalty of twelve months SHU confinement, with corresponding loss of packages, commissary and phones. (Rehearing at 92-94). Plaintiff appealed this determination to defendant Prack, who affirmed it on July 11, 2014. (Prack Decl., Ex. A, at 4).

### C.    Article 78 Hearing and Federal Complaint

Plaintiff challenged defendant Prack's determination in an Article 78 proceeding in New York State Supreme Court. In accordance with state law, the case was transferred to the Appellate Division, Third Judicial Department ("Appellate Division"). The Appellate Division dismissed plaintiff's Article 78 petition in a Memorandum and Judgment dated March 29, 2016. *Thousand v. Prack*, 139 A.D.3d 1212 (3d Dep't May 12, 2016).

On August 24, 2015, plaintiff filed a civil rights complaint. (Dkt. No. 1). In her October 5, 2015 Decision and Order, Judge D'Agostino determined that the following claims survived initial review: Eighth Amendment excessive force claims against defendants Corrigan, Jones and Segovis; Eighth Amendment failure to intervene claims against defendants Carpenter, O'Brien, and Scarlotta; and due process claims against defendant Liberty in her role as hearing officer and defendant Prack in his role

as supervisor and appeals officer. (Dkt. No. 5).

## II.  <u>**Summary Judgment**</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Id.*, 2006 WL 1133247, at *3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

## III.   Exhaustion of Administrative Remedies - Failure to Intervene Claims

### A.   Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of

9

the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the

regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id*. § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at *2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three

11

factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321 at *2. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B.     Application

On February 11, 2014, plaintiff filed a grievance against defendant Corrigan, alleging that the correctional officer assaulted plaintiff on January 21, 2014, and then falsified a misbehavior report to cover up his wrongdoing. (Dkt. No. 30-23, Lisi-

Murray Decl., Ex. H, at 9). Plaintiff exhausted the three-step grievance process in connection with this claim. (Lisi-Murray Decl., Ex. H). In his Rule 7.1 Statement filed in opposition to this motion, plaintiff concedes that his grievance "makes no mention of any other correction officer being present or taking part in the assault." (Dkt. No. 38, ¶ 132). Plaintiff also concedes that his grievance makes no mention of any bystander who witnessed the assault, and does not mention any failure to protect/intervene by any correction official. (*Id*., ¶ 133-34).

Although a grievant is not required to identify the parties against whom he is grieving, he is required to "provide a specific description of the problem." *Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009) (citing N.Y. Comp. Codes R. & Regs., tit. 7 § 701.7(a)(1)). The PLRA's exhaustion requirement requires that prison officials be afforded the time and opportunity to address a complaint internally. "In order to exhaust . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson*, 380 F.3d at 697 (finding the PLRA exhaustion requirement was "not dissimilar to the rules of notice pleading"). Therefore, the question for the court here is "whether [the] plaintiff's grievance sufficiently alerted the prison officials that he was alleging some wrongdoing beyond that alleged against the individual or individuals specifically named in the grievance." *Peele v. Donah*, Case No. 9:15-CV-317 (GTS/TWD), 2016 WL 4400473, at *5 (N.D.N.Y. June 14, 2016) (citation omitted).

Despite plaintiff's failure to include the allegations in his grievance, plaintiff contends that a "reasonable investigation" of the matter would have led "any

competent investigator" to recognize that plaintiff was also alleging that defendants Carpenter, O'Brien, and Scarlotta failed to intervene and prevent the assault on plaintiff. (Dkt. No. 38-1, Pl.'s Br. at 13). Indeed, each of the moving defendants submitted statements or signed off on reports related to the escort of plaintiff and the use of force at his cell. (Lisi-Murray Decl., Ex. H). In addition, all of the correctional officers named as defendants were identified as potential witnesses at plaintiff's disciplinary rehearing, although not all testified. (Rehearing at 15). However, this court concludes that there was nothing in the administrative record that would lead a reasonable investigator to conclude that defendants Carpenter, O'Brien, or Scarlotta, knew or should have known about the alleged assault at any point during which intervention was possible.

Plaintiff's February 11, 2014 grievance described the assault as taking place at "C-5 Company," where his cell was located. (Lisi-Murray Decl., Ex. H at 9). The administrative record places defendants Carpenter and Scarlotta in a wholly separate part of the facility at the time of this assault, still responding to the inmate fight at C-1 Company. (Lisi-Murray Decl., Ex. H at 34). Defendant O'Brien was "in the vicinity" of plaintiff's cell and could potentially observe the use of force from the console area.[7] (Dep. at 42). However, plaintiff admitted during his deposition that O'Brien, stationed in the console, was not in a position to be able to get to the assault and stop

---

[7] In his declaration, defendant O'Brien stated that he did not observe "any other correction official, including but not limited to COs Corrigan, Jones or Segovis . . . use excessive force upon [plaintiff]." (O'Brien Decl. ¶ 7).

it.[8] (*Id*.)  Therefore, this court rejects plaintiff's argument that his grievance should have put Great Meadow officials on notice of potential failure to intervene claims against defendants Carpenter and Scarlotta, who were not located on C-5 Company, or defendant O'Brien, who was unable to reach plaintiff's cell.

Plaintiff's alternate argument, that he sufficiently alerted facility officials of his failure to intervene claims through other means, is similarly unconvincing. (Pl.'s Br. at 14-15).  Although plaintiff was an active participant in both of his Tier III disciplinary hearings and an Inspector General's investigation into the incident, there is nothing in the record to show that plaintiff ever alleged any wrongdoing by defendants Carpenter, O'Brien, or Scarlotta in these alternate forums.  *Collins v. Caron,* Case No. 9:10-CV-1527 (GTS/RFT), 2014 WL 296859, at *4 (N.D.N.Y. Jan. 27, 2014) (describing limited circumstances in which a disciplinary appeal could satisfy exhaustion requirements).  Rather, plaintiff consistently focused his complaints on the assault by defendants Corrigan, Jones, and Segovis. (Rehearing at 45-53; Dkt. No. 39-10 at 25-26, Pl's Decl. Ex. Q, Unauthenticated Transcript of First Disciplinary

---

[8] In order to establish liability for failure to intervene, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.  *See, e.g., Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. May 24, 2010); *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citation omitted). In his response to this motion, plaintiff stated that "[d]ue to the fact that he was the cell control console officer, [O'Brien] was not able to go anywhere.  He remained in the console for the duration of the entire incident." (Dkt. No. 38, ¶ 100).  In light of plaintiff's repeated concession that defendant O'Brien could not reach plaintiff's cell to prevent the alleged assault, this court would recommend summary judgment for defendant O'Brien on the merits if plaintiff had exhausted the grievance process.

Hearing[9]; Dkt. No. 39-12 at 16, Pl.'s Decl., Ex. S, Inspector General's Office Investigative Report)

Plaintiff's final attempt at overcoming his inadequate grievance is also unavailing. He argues that the defendants are estopped from raising the failure to exhaust defense because unidentified Great Meadow officials thwarted his attempt to file an earlier, more detailed grievance. (Pl.'s Br. at 16). Plaintiff points to language in his February 11, 2014 grievance that he was submitting it "[i]n case my complaint wasn't received last time." (Lisi-Murray Decl., Ex. H at 9). Plaintiff has not provided any copies of the alleged first grievance, or even alleged that it included a failure to intervene claim. He also did not appeal this thwarted grievance,[10] and chose to file another grievance instead. Courts have consistently held that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g. Veloz v. New York*, 339 F. Supp. 2d 505, 515-16 (S.D.N.Y. 2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v. Williams*, 186 F. Supp. 2d 353, 357 (S.D.N.Y. 2002) (same). *See also Murray v. Palmer*, Case No. 9:03-CV-1010, 2010 WL 1235591, *2 & nn. 4, 6

---

[9] This court reviewed the unauthenticated transcript solely to assess plaintiff's argument that he alerted Great Meadow officials to his failure to intervene claims in his disciplinary hearings, and reaches no conclusions regarding the accuracy of the transcript.

[10] DOCCS regulations state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2).

(N.D.N.Y. March 31, 2010) (citations omitted).  Therefore,  plaintiff's unsupported claim that Great Meadow officials refused to accept an earlier, more detailed grievance is insufficient to excuse the exhaustion requirement.

After accusing defendant Corrigan of using excessive force, plaintiff also advised in his February 11, 2014 grievance that "[t]his won't be as detailed as the last one, so if more details are needed, someone needs to come see me." (Lisi-Murray Decl., Ex. H at 9).  Although someone did "come see" plaintiff to interview him about the grievance, plaintiff did not offer any details to alert Great Meadow officials of the alleged failure to intervene.  During the interview, plaintiff only identified one potential witness to the alleged assault, an inmate who had been assigned to a nearby cell. (Dkt. No. 30-23 at 15).  There is no record of plaintiff ever mentioning any of the correctional officers that he now accuses of observing and ignoring the excessive use of force.  Even now, plaintiff does not assert that he ever made such allegations during the grievance interview.

Upon review of the only documented grievance regarding the events of January 27, 2014, this court concludes that plaintiff did not sufficiently alert Great Meadow officials to the moving defendants' alleged failure to intervene during the use of force incident.  Therefore, even though plaintiff exhausted his administrative remedies with regard to the excessive force claim against defendants Corrigan, Jones, and Segovis, plaintiff's grievance did nothing to prompt further investigation of any other correctional officers who may have been aware of the alleged Eighth Amendment violation and had an opportunity to intervene.  Great Meadow staff would therefore

have no reason to investigate any alleged wrongdoing by defendants Carpenter, O'Brien, and Scarlotta. *Johnson*, 380 F.3d at 697. Accordingly, defendants Carpenter, O'Brien, and Scarlotta have satisfied their burden of showing a failure to exhaust as to plaintiff's claims of a failure to intervene, and this court recommends that their motion for summary judgment be granted.

## IV. Collateral Estoppel - Due Process and Supervisory Claims

### A. Legal Standards

The doctrine of collateral estoppel[11] provides that once a court has actually and necessarily decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue on a different cause of action involving a party to the first case. *Rivera v. United States*, No. 3:10-CV-1970, 2012 WL 3043110, at *2 n.5 (D. Conn. 2012) (discussing collateral estoppel) (citations omitted). Collateral estoppel is applicable if (1) the issues in both proceedings are identical; (2) the issue of law or fact was "actually litigated and actually decided" in the prior proceeding; (3) the party against whom preclusion is sought had a full and fair opportunity for litigation in the prior proceeding; and (4) the previously litigated issues were necessary to support a valid and final judgment on the merits. *Ali v. Mukasey*, 529

---

[11] Res judicata includes two concepts: claim preclusion and issue preclusion. Issue preclusion is also known as collateral estoppel. *Rivera v. City of New York*, 594 F. App'x 2 (2d Cir. 2014). In claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. The doctrine bars subsequent litigation if the earlier decision was (1) a final judgment on the merits, (2) the previous action involved the plaintiff or those in privity with him, and (3) the claims asserted in the subsequent action were, or could have been raised in the prior action. *Id.* (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000)).

F.3d 478, 489 (2d Cir. 2008) (citing *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986)); *Wade v. City of Kingston*, No. 1:13-CV-623, 2014 WL 4897244, at *4 (N.D.N.Y. Sept. 30, 2014) (citing *Davis v. Halpern*, 813 F.2d 37, 39 (2d Cir. 1987) (citation omitted)). *See also NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 184-85 (2d Cir. 2011) (discussing factors considered for collateral estoppel).

### B.     Application

Plaintiff concedes that he litigated due process claims related to his grievance rehearing via an Article 78 petition before the New York State Appellate Division, Third Department, which was denied on May 12, 2016. *Thousand v. Prack*, 139 A.D.3d 1212 (3d Dep't May 12, 2016). In that state court proceeding, plaintiff challenged the validity of the Tier III re-hearing conducted by defendant Liberty between April 23, 2014 and May 1, 2014, which had been upheld on appeal by defendant Prack. (Dkt. No. 30-15, Lisi-Murray Decl., Ex. D, Article 78 Petition).

The court may take judicial notice of state court decisions and matters of public record. *Pacherille v. Burns*, 30 F. Supp.3d 159, 161, n.3 (N.D.N.Y. July 3, 2014) (quoting *Johnson v. Pugh*, No. 11–CV–385, 2013 WL 3013661, at *2 (E.D.N.Y. June 18, 2013)). The Court may thus take judicial notice of decisions from the Appellate Division. *See Stewart v. Transp. Workers Union of Greater N.Y., Local 100*, 561 F. Supp. 2d 429, 435–36 (S.D.N.Y. 2008). "It is well-settled that collateral estoppel may bar a plaintiff from bringing an action in federal court pursuant to 42 U.S.C. § 1983." *Shell v. Brun*, 362 F. Supp. 2d 398, 400 (W.D.N.Y. 2005) (quoting *Ryan v. N .Y. Tel.*

*Co.*, 62 N.Y.2d 494, 500 (1984)).  *See also Vann v. Fischer*, No. 11 Civ.1958(KPF), 2014 WL 4188077, at *25 (S.D.N.Y. Aug. 25, 2014) (plaintiff barred in § 1983 action from relitigating issues concerning bias and due process violations during prison disciplinary proceeding that were previously raised during Article 78 proceeding).

Defendants have filed relevant portions of the state court record in connection with this motion. (Dkt. Nos. 30-15 to 30-20; Lisi-Murray Decl. Exs. D-F).  Defendants Liberty and Prack argue that plaintiff's federal due process and supervisory claims against them are barred by collateral estoppel[12] because plaintiff unsuccessfully litigated the identical issues in his Article 78 challenge.  A comparison of the federal complaint and the Article 78 state court record confirms the defendants' argument.

The relevant claims in plaintiff's federal complaint that survived *sua sponte* review[13] are as follows:

> (1)    Defendant Liberty refused to allow plaintiff to present witness testimony and refused to inquire why certain witnesses, including inmate Thomas, refused to testify on behalf of plaintiff.

> (2)    Defendant Liberty refused to allow plaintiff to present documentary evidence, specifically a transcript of his first

---

[12] Defendants' brief also references *res judicata*.  Plaintiff's brief correctly notes that *res judicata* or claim preclusion would not bar a § 1983 claim for monetary damages against defendants in their individual capacity. *Davis v. Halpern*, 813 F.2d 37, 39 (2d Cir. 1987); *see also Leo v. N.Y.C. Dep't of Educ.*, No. 13 CV 2271(RJD)(JMA), 2014 WL 6460704, at *4 (E.D.N.Y. Nov. 17, 2014) (res judicata doctrine did not apply to plaintiff's § 1983 claims because plaintiff could not have received damages for violations of his civil rights in his prior Article 78 proceeding).

[13] Judge D'Agostino's October 5, 2015 Decision and Order dismissed due process claims against defendants Corrigan, Jones, Segovis, Scarlotta, and O'Brien for alleged false testimony, and against two John Doe correctional officers for allegedly intimidating inmate Thomas prior to his testimony. (Dkt. No. 5 at 16).

grievance hearing;

(3)    Defendant Liberty disregarded conflicting testimony from correctional officer witnesses and her final determination was influenced by bias against plaintiff;

(4)    His re-hearing was untimely because it did not take place within the seven day window proscribed by DOCCS regulations;

(5)    Defendant Prack was aware of the constitutional defects in the re-hearing and failed to remedy them on administrative appeal.

(Dkt. No. 5, at 16-17).

Plaintiff asserted the following causes of action in the Article 78 proceeding:

(1)    He was denied the opportunity to present witnesses, including inmate James Thomas, due to intimidation by correctional officers and defendant Liberty's failure to inquire into the reasons for their refusal to testify;

(2)    Defendant Liberty improperly denied plaintiff's request to submit a transcript of his prior proceeding that had been prepared by petitioner's attorney;

(3)    Defendant Liberty did not have substantial evidence to support her determinations;

(4)    The re-hearing was untimely and in violation of DOCCS regulations;

(5)    Defendant Liberty was biased and permitted correctional officer witnesses an opportunity to coordinate their testimony in order to correct inconsistencies.

(Dkt. No. 30-15 at 6-15, Article 78 Petition).

The Appellate Division affirmed the disciplinary hearing, and in doing so, decided each of the due process claims that plaintiff now raises in federal court.

*Thousand*, 139 A.D.3d at 1212-1213. For example, the state court flatly rejected plaintiff's claim that he was denied the right to call inmates as witnesses. *Id.* at 1213. The decision noted that three of the requested inmates had signed witness refusal forms, and that defendant Liberty (described as "the Hearing Officer") obtained confirmation from each of these witnesses that their refusal was knowing and voluntary. *Id.* Defendant Liberty also made several unsuccessful efforts to contact a fourth requested inmate witness, who had been released prior to the rehearing. *Id.*

In addition, the Appellate Division considered inmate Thomas' testimony that he had no recollection of the incident, and found defendant Liberty had appropriately handled the witness. The state court noted that plaintiff did not ask Thomas any questions during the rehearing, "despite an opportunity to probe his lack of recall." *Id.* The Appellate Division also affirmed defendant Prack's determination to deny plaintiff's administrative appeal despite inmate Thomas's subsequent "unsworn and unsubstantiated letters" claiming that his testimony was influenced by threats from unidentified correctional officers. *Id.*

The Appellate Division could find no error in defendant Liberty's denial of plaintiff's request to submit an unauthenticated transcript of his first hearing as evidence. *Id.* The state court noted that defendant Liberty could not authenticate the purported transcript, and relevant witnesses were available for this hearing, even though they refused to testify. On the timeliness issue, the Appellate Division found that "[t]he extension of the rehearing was timely requested by the Hearing Officer in order to permit petitioner to receive his requested assistance, and he has not

demonstrated any prejudice as a result of the brief delay." *Id.* at 1213 (citation omitted).

"Parties to a previous Article 78 proceeding generally have had a full and fair opportunity to litigate the issues raised in that proceeding." *Rahman v. Acevedo*, No. 08 Civ. 4368(DLC), 2011 WL 6028212, at *5 (S.D.N.Y. Dec.5, 2011) (citing *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir.2003)). Plaintiff argues that collateral estoppel should not apply in this case, but has offered no evidence to support this conclusion.

First, plaintiff contends that the Appellate Division misapplied relevant state court precedent and that its dismissal of his Article 78 petition was "arbitrary and capricious." (Dkt. No. 38-1, Pl.'s Br. at 22). This argument is precisely the type of situation – "relitigation of claims already decided under constitutionally adequate circumstances" – that collateral estoppel is intended to prevent. *Giakoumelos v. Coughlin*, 88 F.3d 56, 61 (2d Cir. 1996). Likewise, his argument that defendant Liberty's actions at the disciplinary hearing prevented him from introducing relevant evidence, such as the full unauthenticated hearing transcript, before the Appellate Division (Pl.'s Br. at 22-23) is simply a restatement of his unsuccessful state court due process claim. *Thousand*, 139 A.D.3d at 1213, n.2 (". . . we discern no error in the Hearing Officer's denial of petitioner's request to admit into evidence, as direct proof, the purported transcript of the testimony of these witnesses at the first hearing offered by petitioner, which the Hearing Officer was not able to authenticate.").

Finally, plaintiff argues that he was denied a full and fair opportunity to present his claims before the state court because "[i]t was not until after the conclusion of the

rehearing and the initiation of the Article 78 proceeding that plaintiff was able to receive a sworn affidavit from James Thomas" regarding witness intimidation. (Pl.'s Br. at 23). This assertion is contradicted by the record. The "sworn affidavit" cited by plaintiff and included as Exhibit B to his declaration in this proceeding is the same May 11, 2014 correspondence that was offered as part of his administrative appeal and made part of the Article 78 record. (Dkt No. 39 at 119, Pl.'s Decl., Ex. B; Prack Decl., Ex. A at 26; Dkt. No. 30-18 at 26, Lisi-Murray Decl., Ex. E). It is one of the "unsworn and unsubstantiated" letters discussed by the Appellate Division. *Thousand*, 139 A.D.3d at 1213. Therefore, any district court review of plaintiff's due process claims would be based on "essentially the same record . . .that the Appellate Division had before it." *Giakoumelos*, 88 F.3d at 61.

Thus, for purposes of the collateral estoppel analysis, this court finds that plaintiff's due process claims in this action are identical to those he raised in the Appellate Division; the issues were "actually decided" in the Appellate Division; plaintiff had a full and fair opportunity for litigation in the Appellate Division proceeding; and the issues litigated in the Appellate Division were necessary to support a valid and final judgment on the merits. Plaintiff cannot now relitigate the claims that he lost in the Appellate Division in a section 1983 action.[14] Therefore, this court recommends that plaintiff's due process and supervisory claims as against

---

[14] The application of collateral estoppel in civil rights actions under section 1983 is in contrast to the "traditional exception to res judicata for habeas corpus review." *See Allen v. McCurry*, 449 U.S. 90, 98 n.12 (1980). Plaintiff in this case has not brought an action for habeas review and has waived any challenge to his good time under *Peralta*, thus, no exception to the application of collateral estoppel applies.

defendants Liberty and Prack be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for partial summary judgment (Dkt. No. 30) be **GRANTED,** and that all of plaintiff's claims against defendants Carpenter, O'Brien, Scarlotta, Liberty, and Prack be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: December 5, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge